UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CASEY H. SUMMERS, ET AL.                                                                 PLAINTIFFS

V.                                                       CIVIL ACTION NO. 3:20-CV-266-DPJ-FKB

HINDS COUNTY, MISSISSIPPI,                                                              DEFENDANTS
ET AL.

ORDER

Hinds County Sheriff's Deputies Joel Williams, Jason Pittman, Louis Hall, and Tony Taylor allegedly shot into a vehicle carrying a criminal suspect, his wife, and their six children. The wife and six children sued the officers under 42 U.S.C. § 1983, and the deputies now seek qualified immunity on Plaintiffs' individual-capacity claims against them. Mot. [8]. For the following reasons, the motion to dismiss is granted in part and denied in part.

I.     Facts and Procedural History

The facts are taken from the Complaint [1-1]. On May 17, 2018, Jonathan Summers, Plaintiff Casey Summers's husband, received a phone call informing him that law-enforcement officers were at his home in Raymond, Mississippi. Jonathan later learned that the officers were there to serve him with active misdemeanor warrants and a felony warrant for fleeing/alluding law enforcement. At the time, Johnathan, Casey, and their six children (who ranged in age from six months to 12 years) were together in a vehicle that Jonathan was driving.

"Deputy Pittman spotted Jonathan's car and transmitted this information to Deputy Williams," who "saw the car" and "initiated a traffic stop by turning on his blue lights." Compl. [1-1] ¶ 12. Jonathan pulled off the road into a parking lot "and turned the engine off when the deputies told him to." *Id.* ¶ 13. "Deputy Pittman pulled alongside Jonathan on the driver's side, Deputy Hall parked on the passenger side, and Deputy Williams parked at Jonathan's rear.

Deputy Taylor was the last to arrive on the scene and parked his vehicle somewhat in front of Jonathan's car, but not totally blocking it." *Id.* The deputies "exited their vehicles with guns drawn yelling for Jonathan to raise his hands and not move." *Id.* ¶ 14. One of the children in the vehicle heard a deputy say, "hold your fire—kids are in the car." *Id.* Jonathan complied with the order to raise his hands and "asked Deputy Williams if he could give his wife a kiss before exiting the car." *Id.* Without response from Williams, "Jonathan moved his head to his right to give his wife a good-bye kiss." *Id.* His hands were "still held high." *Id.* ¶ 16.

"[S]uddenly and without provocation, Deputies Pittman and Hall shot into the car two or three times." *Id.* "Fearing for his life, and the lives of his wife and six children, Jonathan instinctively turned on the car and drove around the police car in front of him, slightly touching it." *Id.* ¶ 17. "As Jonathan attempted to escape the shooting, the Deputies fired more shots at and into his car." *Id.* ¶ 19. Bullets grazed Casey's shoulder and one child's neck.

Deputies Pittman, Hall, and Williams then pursued Jonathan in a chase, and Plaintiffs aver, "[o]n information and belief," that Deputy Taylor joined in as well. *Id.* ¶ 18. During the chase, Jonathan traveled down Highway 18 "at a high rate of speed," ran a red light, and hit a truck. *Id.* ¶ 19. The deputies arrested Jonathan at the scene and charged him with felony fleeing, aggravated assault, and six counts of child endangerment. Several of Jonathan and Casey's children sustained injuries as a result of Jonathan's encounter with the deputies and subsequent crash.

On February 4, 2020, Casey, individually and as the mother and next friend of her six minor children, filed this lawsuit in Hinds County Circuit Court against Hinds County and Deputies Williams, Pittman, Hall, and Taylor in their individual and official capacities. Plaintiffs allege the deputies' conduct "deprived [them] of their right[s] to be free [from]

unreasonable search[es] and seizures under the Fourth Amendment and to due process of law under the Fourteenth Amendment."  Pls.' Mem. [14] at 1–2.  Defendants removed the case on April 16, 2020, and filed answers.  The deputies now seek judgment on the claims against them in their individual capacities, citing qualified immunity.  Briefing has closed, and the Court has both personal and subject-matter jurisdiction to decide the issues.

II.     Standard

Defendants' motion arises under Federal Rule of Civil Procedure 12(c), the standard for which "is the same as a Rule 12(b)(6) motion to dismiss."  *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).  According to Defendants, that standard is heightened when addressing § 1983 claims where qualified immunity has been asserted.  *See* Defs.' Mem. [9] at 7–9.  But "Section 1983 claims implicating qualified immunity are subject to the same Rule 8 pleading standard set forth in *Twombly* and *Iqbal* as all other claims; an assertion of qualified immunity in a defendant's answer or motion to dismiss does not subject the complaint to a heightened pleading standard."  *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (citing *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016)).

When considering a motion under Rule 12(c), the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam)).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To overcome a Rule 12(c) motion, a plaintiff must plead "enough facts to state a claim

to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555 (citations and footnote omitted).

III.     Analysis

    A.     Insufficient Pleadings

As noted, Defendants incorrectly argue that a heightened pleading standard applies. They then say the Complaint fails to meet that standard because there are no allegations regarding which deputies fired into the vehicle after Jonathan fled. They also say the Complaint omits other details—like where the deputies stood when they fired their shots. Defs.' Mem. [9] at 7–10.

The Complaint satisfies the Rule 8 standards. While it is true the Complaint does not address every conceivable fact, it offers substantial detail and provides "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

As to which deputies discharged their firearms, the Fifth Circuit does "not require a plaintiff to plead facts 'peculiarly within the knowledge of defendants,' and the facts omitted fall squarely within that category." *Morgan v. Hubert*, 335 F. App'x 466, 472 (5th Cir. 2009) (quoting *Schultea v. Wood*, 47 F.3d 1427, 1432 (5th Cir. 1995)). For example, in *Grandstaff v. City of Borger*, the Fifth Circuit rejected the assertion that a plaintiff must plead which of many officers fired the shots. 767 F.2d 161, 168 (5th Cir. 1985). Defendants' general attacks on the sufficiency of the pleading fall short.

B. Qualified-Immunity Standard

As summarized by the Fifth Circuit,

> [T]he doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal. This immunity protects all but the plainly incompetent or those who knowingly violate the law. Accordingly, we do not deny immunity unless existing precedent . . . placed the statutory or constitutional question beyond debate. The basic steps of this court's qualified-immunity inquiry are well-known: a plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the alleged conduct.

*Anderson*, 845 F.3d at 599–600 (footnotes omitted) (quotation marks omitted) (punctuation altered).

Thus, "a court addressing a claim of qualified immunity must determine first whether the plaintiff has adduced facts sufficient to establish a constitutional or statutory violation." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). Second, if a violation has been alleged, the Court must determine "whether [the officer's] actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)). And "[w]hen a defendant raises qualified immunity, the burden is on the plaintiff to 'demonstrate the inapplicability of the defense.'" *Coleman v. Marion Cnty.*, No. 2:14-CV-185-DPJ-FKB, 2015 WL 5098524, at *6 (S.D. Miss. Aug. 31, 2015) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)).

In the present case, the Court must apply these standards to Plaintiffs' claims that the deputies violated their (1) Fourth Amendment right to be free from unreasonable search; (2) Fourth Amendment protection from excessive force; and (3) Fourteenth Amendment right to due process.

1.      Fourth Amendment Search Claim

While Plaintiffs plead a Fourth Amendment search claim in their Complaint, the Complaint does not allege—and their brief does not discuss—any search of any plaintiff. Because Plaintiffs failed to respond to the deputies' argument as to the illegal-search claim, the Court considers the claim abandoned and dismisses it. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (finding plaintiff abandoned claim when she failed to defend it in response to motion to dismiss).

2.      Fourth Amendment Excessive-Force Claim[1]

"To bring a § 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that she was seized." *Flores*, 381 F.3d at 396 (citing *Graham*, 490 U.S. at 388

---

[1] Plaintiffs pleaded their excessive-force claim in the alternative, asserting Fourth and Fourteenth Amendment violations as to both the initial stop and the post-flight conduct. In other words, they lumped the entire encounter together and argued that it violated both constitutional amendments. They did the same in their summary-judgment response after Defendants' opening brief took that approach. While alternative arguments are allowed, only one constitutional amendment can apply to Plaintiffs' excessive-force allegations. *See Graham v. Connor*, 490 U.S. at 386, 394 (1989) (holding that claims related to seizures must be analyzed under Fourth Amendment and not Fourteenth). Here, the applicable amendment might be different for the pre- and post-flight force. That would depend—at least in part—on whether Plaintiffs were seized throughout the encounter, a potentially tricky and fact-dependent question. *See, e.g., Flores v. City of Palacios*, 381 F.3d 391, 397 (5th Cir. 2004) (finding that shots fired at plaintiff's vehicle constituted seizure because she immediately stopped but distinguishing other cases where no seizure was found because plaintiffs "continued to drive after being hit"). Here, the Complaint suggests that Jonathan did not stop after the second shots. Compl. [1-1] ¶ 19. So, it is possible the Fourteenth Amendment would apply to everything that happened after the first shots or, perhaps, after the second shots.

At this point, neither side squarely addresses these concerns. At most, Defendants' reply includes a post-flight section under the Fourth Amendment analysis, but that section offers no arguments unique to the Fourth Amendment; nor does it suggest which amendment applies at each stage of the encounter. *See* Defs.' Reply [17] at 7. The Court is reluctant to take a deep dive into these thorny issues without the parties' input and recognizes that further development may become necessary.

(1989)). "Next she must show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Id.* (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)).

To begin, the deputies seized Plaintiffs when they pulled them over. A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (citation omitted) (quotation marks omitted). And significantly here, "a law enforcement officer's stop of an automobile results in a seizure of both the driver and the passenger." *Id.* at 259.

Despite this law, Defendants argue that they never seized Casey and her children because Jonathan was their target. As they note, seizures exist "only when there is a governmental termination of freedom of movement through means intentionally applied." Defs.' Reply [17] at 4 (quoting *United States v. George*, No. 6:19-CR-00337-01, 2020 WL 3088588, at *6 (W.D. La. May 7, 2020)). And because the deputies never intended to shoot Jonathan's family, they claim that Plaintiffs were never seized.

This argument fails because when they seized Jonathan, the deputies seized his passengers too. *Brendlin*, 551 U.S. at 255. In addition, the Fifth Circuit has twice found excessive-force violations where officers fired at vehicles or dwellings holding suspects and innocent third parties. *See Petta v. Rivera*, 143 F.3d 895 (5th Cir. 1998) (holding that officer's

shots were "directed not only towards [the children's mother] but towards the car that [the children], too, occupied"); *Coon v. Ledbetter*, 780 F.2d 1158, 1160–61 (5th Cir. 1986) (finding that suspect's four-year-old daughter stated an excessive-force claim because officers knew, or should have known, that she was in her father's trailer when officers shot into it).  Plaintiffs cite *Coon* in response to Defendants' argument that they were not the intended target; Defendants did not address it in reply.  And here, a jury could find the deputies intended to shoot at Plaintiffs' vehicle; bullets eventually grazed two Plaintiffs.

Defendants alternatively claim that the initial stop was unrelated to the alleged excessive force because the deputies merely utilized their blue lights to pull Jonathan over; thus, "[e]ven assuming Plaintiffs were momentarily seized when the car in which they were riding was blue lighted, the force used was ONLY the blue lights." Defs.' Reply [17] at 3.  Defendants further argue that "[t]here was no 'seizure' of Plaintiffs by means of the shots fired as Plaintiffs admit they were not physically struck by the [initial] shots and it did not terminate their leaving the scene.  Firing and missing does not amount to a seizure." *Id.*

These arguments are not compelling.  The deputies cite no cases supporting their apparent argument that once they seized the Plaintiffs without excessive force, nothing else that happened during the stop could give rise to an excessive-force claim.  And contrary to that position, "all claims that law enforcement officers have used excessive force . . . *in the course of an arrest*, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395 (emphasis added).

Moreover, the show of force continued after the blue lights.  According to Plaintiffs, four deputies approached their vehicle yelling with guns drawn.  This would lead any reasonable

8

person to conclude that he was not "free to leave." *Brendlin*, 551 U.S. at 255.  A jury could also reasonably find that the first shots were fired to maintain that seizure.  That the bullets initially missed all six children and Casey Summers does not change the fact that they were seized when the deputies pulled their triggers.

Defendants next contend that even assuming a seizure, the "Complaint does not allege any injuries as a result of the initial shots," Defs.' Mem. [9] at 8, and only the two plaintiffs who were grazed by bullets have pleaded an injury as to the second round of shots, *id.* at 9.  Plainly, Plaintiffs assert both physical and non-physical injuries in their Complaint:

> As a result of the [d]eputies' actions, [they] suffered numerous serious physical, mental and emotional injuries.  Although some of the children fortuitously escaped physical injury, all of them suffered psychological pain, injuries and disabilities resulting from the [d]eputies' unlawful, unreasonable, unnecessary, and excessive use of deadly force in shooting into the car and chasing them and the resulting car crash.

Compl. [1-1] ¶ 22.  And Plaintiffs argue in their response that psychological injuries are sufficient.  They are correct.  The Fifth Circuit noted in *Flores* that "[w]hile certain injuries are so slight that they will never satisfy the injury element, psychological injuries may sustain a Fourth Amendment Claim."  381 F.3d at 397–98.

Defendants acknowledge this law in their reply but pivot to say "Plaintiffs fail to specify the causal connection of those injuries to the shots."  Defs.' Reply [17] at 5.  With due respect to able counsel, this is a specious point.  Plaintiffs allegedly witnessed four deputies approach them yelling with guns drawn before shooting into their vehicle.  That alone would plausibly cause psychological injuries, especially for the six children—all under the age of 12.  So too, a jury could find that watching someone try to shoot a father or spouse could cause injury.

Essentially the same thing happened in *Petta*, where the Fifth Circuit held that the

> evidence fully supports a reasonable inference that the Petta children have suffered psychological pain, injuries and disabilities as the result of Rivera's use

9

>of deadly force and extreme violence in attempting to shoot, break into, and pull over the Petta vehicle, after cursing, yelling at, and threatening to kill their mother.

143 F.3d at 903; *see also Coon*, 780 F.2d at 1164 (holding that four-year-old innocent bystander stated constitutional violation though officers' shots did not strike her).

Defendants' final argument regarding the Fourth Amendment excessive-force claim states that "even considering the injuries as sufficient, Plaintiffs have failed to provide allegations sufficient to demonstrate the deputies' actions were objectively unreasonable under the circumstances." Defs.' Reply [17] at 5. In response, Plaintiffs characterize the level of force deployed as deadly and argue—based on *Tennessee v. Garner*—that such force may not be used "unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Pls.' Mem. [14] at 7 (quoting *Garner*, 471 U.S. 1, 3 (1985)) (emphasis removed).

The Supreme Court has since clarified that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' *Garner* was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation." *Scott v. Harris*, 550 U.S. 372, 382 (2017). So rather than apply a bright-line rule as Plaintiffs suggest, the Court must assess "whether [the deputies'] conduct was 'objectively reasonable.'" *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Scott*, 550 U.S. at 381).

Whether the deputies used force that was objectively unreasonable "depends on 'the facts and circumstances of [the] particular case.'" *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Graham*, 490 U.S. at 396). "Some relevant considerations include 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers

or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

Defendants' Fourth Amendment argument focuses on the first shots that were fired rather than what happened next. Though included in the Fourteenth Amendment section of their brief, they explain the factual basis for their reasonableness argument as follows: "Given the facts as alleged in the Complaint, it is completely reasonable that officers stepped back and fired shots as they had no idea whether Jonathan was *reaching for a weapon* or was going to try to run over them while fleeing." Defs.' Reply [17] at 14 (emphasis added). This argument works only by changing the pleaded facts. The Complaint does not say the officers stepped back, that Jonathan reached for a weapon, or that any officer was in danger of being run over. Indeed, the Complaint alleges that there were no officers standing in front of the vehicle when Jonathan pulled away. Compl. [1-1] ¶ 18.

Viewing the well-pleaded facts in the light most favorable to Plaintiffs, Jonathan—who had outstanding warrants for felony fleeing and misdemeanor offenses—complied with the deputies' instruction to pull over; turned his engine off; complied with their request that he raise his hands; and then asked if he could kiss his wife goodbye before going to jail. *Id.* at ¶¶ 12–14. He received no response but still "moved *his head* to his right to give his wife a good-bye kiss" with his hands "still held high." *Id.* ¶ 16 (emphasis added). Jonathan was not arguing and took "no action that could have been perceived as resisting arrest," yet "Deputies Pittman and Hall shot into the car two or three times" without further warning. *Id.* Significantly, Jonathan was sitting in his car—engine off—with his wife and six young children when the deputies opened fire. *Id.* ¶ 14. Nothing in the pleaded facts suggests Jonathan posed an immediate threat when Deputies Pittman and Hall shot, much less a threat that would allow the use of deadly force that

11

endangered Jonathan's wife and six children. And the same is true for the shots fired as he was pulling away; there were no deputies in the car's path. *Id.* ¶ 18. The facts *as pleaded* state a plausible claim that the level of force was excessive.

So, the final qualified-immunity question as to the Fourth Amendment claim is "whether [the deputies'] actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Collier*, 569 F.3d at 217 (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2017)).

> A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. ——, ——, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).

*Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Clearly established law would preclude the alleged actions in this case. Jonathan's underlying warrants were for relatively minor offenses, and the felony fleeing was a non-violent charge. He was sitting in a car full of kids with his hands raised, and there is no suggestion in the pleaded facts that he presented an "immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. Significantly, he was not "actively resisting arrest or attempting to evade arrest by flight" when officers first shot into his car—indeed the engine was off. In *Amador v. Vasquez*, the Fifth Circuit held that it would violate clearly established law for an officer to shoot a suspect who was holding a knife but had his hands raised and was submissive

12

when shot. 961 F.3d 721, 730 (5th Cir. 2020). The same would be true here. So, the Fourth Amendment excessive-force claim survives qualified immunity at the Rule 12(b)(6) stage.

Finally, as noted above, the parties did not squarely differentiate between the pre- and post-flight force. Plaintiffs do, however, cite a case that is much like their pleaded facts regarding the second round of shooting. In *Lytle*, officers engaged in a quarter-mile high-speed chase of a fleeing felon they believed was armed. 560 F.3d at 417. When the suspect stopped and began backing toward the officer, the officer fired his sidearm, hitting and killing a child riding in the backseat. *Id.* The Court found that if the jury accepted the plaintiff's facts, it could find that the chase was too short to establish that the suspect presented an immediate danger. *Id.* at 416. Here, Plaintiffs say the additional shots were fired "[a]s Jonathan attempted to escape the shooting." Compl. [1-1] ¶ 19. The pleadings do not suggest that anyone was in immediate danger at that point. If Plaintiffs were still considered seized during the second round of shooting, then the facts are even more unreasonable than those in *Lytle*.

That said, the Fifth Circuit has questioned *Lytle*'s validity after *Mullenix*. *See Morrow v. Meachum*, 917 F.3d 870, 879 (5th Cir. 2019). And in any event, the Court questions whether the Fourteenth Amendment might instead apply if the second shots did not stop Jonathan—an unclear fact issue. Unfortunately, Defendants did not address *Lytle* in reply and have not suggested that it has been overruled or is inapplicable. So at this point—and on this record—*Lytle* is factually similar enough to satisfy the *Mullenix* similarity requirement. *See Morrow*, 917 F.3d at 879 (noting that gunshot cases like *Lytle* were too "factually dissimilar" from vehicle-collision cases to create clearly established law). Because this is underdeveloped in the briefs, the Court will not go further; Defendants are free to revisit the matter under Rule 56. For now,

the Fourth Amendment claims against the deputies in their individual capacities will move forward.

### 3. Fourteenth Amendment Due-Process Claim

To the extent the deputies' actions did not involve a seizure under the Fourth Amendment, Plaintiffs' recourse, if any, arises under the Fourteenth Amendment. Where a citizen alleges an officer deployed excessive force against her in circumstances not involving a seizure or not otherwise "susceptible to proper analysis with reference to a specific constitutional right," she "may still state a claim under § 1983 for a violation of . . . her Fourteenth Amendment substantive due process right, and have the claim judged by the constitutional standard which governs that right." *Petta*, 143 F.3d at 901.[2]

In *County of Sacramento v. Lewis*, the Supreme Court established the standards for determining whether a police pursuit resulting in harm violates the injured party's substantive due-process rights. 523 U.S. 833 (1998). The Court stated that the "touchstone of the due process clause is protection of the individual against arbitrary action of government." *Id.* at 845. The Court further explained that only "conscience shocking" or "the most egregious official conduct" is so arbitrary as to violate due process. *Id.* at 846. And these standards are higher

---

[2] Defendants argue that "[t]he Fourteenth Amendment applies when a Plaintiff seeks remuneration for physical injuries 'inadvertently inflicted upon an innocent third party' by police officers." Defs.' Mem. [9] at 12 (attributing quote to *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989)). *Brower* did not include that quote. The quote appears to instead come from *Gray v. Dalton*, No. 1:15CV061-SA-DAS, 2017 WL 74716, at *4 (N.D. Miss. Jan. 6, 2017) (citing *Brower*), *on reconsideration in part sub nom. Gray v. Dalton*, 2017 WL 564035 (N.D. Miss. Feb. 10, 2017). The Court is not convinced that *Gray* would apply here. Regardless, there is a difference between an innocent bystander who is inadvertently injured and someone who occupies a car that the officers intentionally shoot. *See Petta*, 143 F.3d at 903 (finding Fourteenth Amendment violation under those facts). Moreover, the argument does not address the possibility that different tests may apply to different points during the full interaction between these parties. As noted, the Fourteenth Amendment would not apply if the plaintiffs were seized. *Graham*, 490 U.S. at 394.

14

when "unforeseen circumstances demand an officer's instant judgment." *Id.* at 853. In such circumstances, "even precipitated recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the 'large concerns of the governors and the governed.'" *Id.* at 853 (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)). In sum,

> [I]f [Plaintiffs] can prove that [the deputies'] actions caused them any injury, were grossly disproportionate to the need for action under the circumstances and were inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, they will have stated a valid claim under § 1983 based on violation of their substantive due process rights . . . .

*Id.* at 902.

Plaintiffs acknowledge their burden to show conscience-shocking behavior and cite several Fifth Circuit cases they find similar to their pleaded facts. For starters, Plaintiffs rely on *Petta*. There, highway patrolman Rivera stopped plaintiff Melinda Petta for speeding; Petta's two small children were in the vehicle with her. Petta and Rivera argued over her speed, and Rivera ordered her out of the vehicle. She refused and rolled up her window. The confrontation escalated and "culminated when Rivera menaced her with his .357 Magnum handgun." 143 F.3d at 897. Petta "panicked and fled the scene," and "Rivera fired a shot at her car as she drove away." *Id.* at 897–98. A high-speed chase ensued, during which "Rivera again shot at [Petta's] vehicle, attempting to blow out her tires." *Id.* at 898. "The pursuit ended with Petta's arrest by several officers at her apartment. Petta's children were never taken into custody nor were they touched by any officers." *Id.*

Petta sued Rivera on behalf of her minor children. Among her claims were excessive-force § 1983 claims under the Fourth and Fourteenth Amendments. The district court granted summary judgment on the Fourth Amendment claim finding no seizure but allowed the

15

Fourteenth Amendment due-process claim to proceed. *Id.* Only the Fourteenth Amendment ruling was appealed. *Id.*

The Fifth Circuit found that under the applicable standards, "Rivera's actions violated the substantive due process rights of the Petta children." *Id.* at 903. The court emphasized that Petta had done nothing more than exceed the speed limit: "[t]he only action necessary under the circumstances was the issuance of a traffic ticket." *Id.* at 902. Nevertheless, the court concluded that, at the time of the incident in *Petta*, it was not clearly established that a plaintiff could succeed on a Fourteenth Amendment excessive-force case "where the only injuries allegedly suffered were psychological." *Id.* at 914. It therefore held Rivera was entitled to qualified immunity. *Id.* (reversing denial of summary judgment).

That core holding is no longer true; *Petta* establishes that psychological injuries are enough. *Id.* at 903. But Defendants say the finding of a due-process violation in *Petta* is distinguishable for three reasons: (1) the officer in that case had "ample time" to deliberate before chasing and shooting at Petta's vehicle; (2) the actions in this case were not grossly disproportionate; and (3) the underlying offenses are different. Defs.' Reply [17] at 14.

Defendants' first argument fails because the confrontation in *Petta* escalated rapidly and the circumstances of her flight were just like the circumstances here. She panicked and fled, and the officer shot as she departed. 143 F.3d at 897–98. More significantly, the Fifth Circuit applied the *Lewis* standard for heat-of-the-moment actions rather than the lesser standards applied to more deliberative decisions. *Id.* at 902 (requiring proof that actions "were grossly disproportionate . . . and were inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience").

Most of Defendants' remaining arguments for saying the conduct was not grossly disproportionate relate to the initial shots. In that regard, Defendants distinguish *Petta* arguing that they reacted reasonably because "they had no idea whether Jonathan was reaching for a weapon or trying to run over them." Defs.' Reply [17] at 14. But as noted above, that argument depends on Defendants' version of the facts rather than Plaintiffs'.

As for the differing offenses, Defendants correctly note that Jonathan was wanted on an outstanding felony-fleeing warrant whereas Petta was pulled over for speeding. *Id.* True, but that does not tell the full story. It is also relevant that Jonathan's underlying warrants were for misdemeanors; he voluntarily pulled over; he turned his car off; and like Petta, he was sitting in a car with his family. Compl. [1-1] ¶ 14. Unlike Petta, he did not argue with the deputies and nothing Jonathan did suggested that he was resisting arrest—his hands remained raised above his head at all times. *Id.* At most, he tried to kiss his wife goodbye—hands raised—after announcing his desire to do so before going to jail. *Id.* He, like Petta, panicked and fled, but Jonathan arguably had better reason because officers fired on his vehicle before he did so. *Id.* ¶ 16. Indeed, one bullet "passed by Jonathan's head." *Id.* ¶ 17.

When he did flee, Jonathan did not attempt to run over any of the officers and instead "drove around the police car in front of him, slightly touching it." *Id.* ¶ 17. "[N]one of the Deputies were in front of the car or in any danger of being hit by the car." *Id.* ¶ 18. The deputies knew all this as Jonathan pulled off, yet they fired a second round of shots into a car filled with children and then engaged in a high-speed chase, like the officer in *Petta*. *Id.* ¶¶ 14, 19. They also knew where Jonathan lived and could have attempted to arrest him later. *Id.* ¶ 11.

The Court suspects the deputies will tell a different story at the appropriate time. But taking the pleaded facts in the light most favorable to Plaintiffs, they have plausibly pleaded a

17

claim that the deputies used force "grossly disproportionate to the need for action under the circumstances and were inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience." *Lewis*, 523 U.S. at 902. Finally, the actions—if proven—would be close enough to *Petta* to violate clearly established law. *Id.; see also al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

IV.     Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the foregoing reasons, Williams, Hall, Pittman, and Taylor's Motion for Judgment on the Pleadings based on Qualified Immunity [8] is granted in part. The Court dismisses the Fourth Amendment search claim against all Defendants, but the motion is otherwise denied. The parties are directed to contact Judge Ball's chambers to set the case for a case-management conference.

**SO ORDERED AND ADJUDGED** this the 21st day of December, 2020.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE